Bernard Nader, J.
Plaintiff seeks an injunction directing the defendant New York Medical College, certain of its officers and members of the Admissions Committee to accept and register plaintiff as a member of the 1969 entering class of said medical college, or in the alternative damages to compensate her for loss of potential future earnings as a prosperous doctor.
Plaintiff filed an appropriate application for admission to the uP§9 fall term. Her application disclosed that she had been a voluntary patient in a mental hospital from April, 1966 to June, 1967. In the medical college admission test she scored in the 99th percentile in science and quantitative ability. She was Phi Beta Kappa at City College and was awarded many scholastic honors. 'From the 2,800 applicants, she was one of about 800 who were selected for interviews with members of the Admissions Committee. She was interviewed by Dr. Raymond A. McBride on November 26,1968, and by Dr. Benjamin Sadock, on December 11, 1968. On January 15, 1969, plaintiff received from the college a letter of rejection.
Plaintiff contends that defendants violated .subdivision 5 of section 70 of the Mental Hygiene Law in that they rejected her application for admission to New York Medical ¡College solely because she had been in the past a voluntary mental patient, or in the alternative that defendants relied upon her past mental history to modify, vary and reduce her competitive ranking in relation to other applicants for admission; and that past mental history may not be considered. Plaintiff further contends that the defendants’ rejection of her application constituted a denial *468 of due process and equal protection of the State and Federal Constitutions.
Defendant contends that plaintiff’s application was processed in the ordinary course; that the decision to reject her was based on an evaluation of her entire record, including her college grades, her recommendations, her medical aptitude tests and her interviews; that the committee gave consideration to her ability to function in the pressurized environment of the medical curriculum and the demands which would be made upon her as a prospective doctor; and that after giving weight to all the criteria, the Admissions /Committee decided that in spite of her obviously high academic qualifications, there were many others among the 2,800 applicants who were more qualified.
This is the first case tried under subdivision 5 of section 70 of the .Mental Hygiene Law which provides as follows: “ 5. Notwithstanding any other provision of law to the contrary no person admitted to a hospital by voluntary or informal admission shall be deprived of any civil right solely by reason of such admission nor shall such admission modify or vary any civil right of any such person, including but not limited to civil service ranking and appointment or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law.”
Plaintiff, in effect, contends that the above section of the Mental Hygiene Law prohibits the Admissions Committee from considering her prior mental illness or past mental .history for any purpose whatsoever. This contention is without merit. Such is not the word nor intent of the Legislature. This section does not prohibit consideration of the illness which necessitated, or was the reason for, the admission to a mental hospital. It prohibits rejection of an applicant solely by reason of .such admission.
It was not the policy of the medical college to accept only those students with the highest academic grades and recommendations. The interview was an important factor. Based on her grades, letters of recommendations and admission tests, plaintiff’s rating was 12. A rating above 9 called for an interview. Some applicants with a rating of 12 were admitted; some with a rating of 12 were rejected. Some applicants with a rating as high as 14 and 15 were rejected. Many applicants who had prior-psychiatric treatment were accepted; some were rejected. The evidence indicates that high academic ranking in itself was not a sure ticket of admission. With 2,800 applicants competing for 138 available seats, there is^ no question that some qualified students had to be denied admission.
*469 It was the policy of the Admissions Committee to consider interruptions in an academic career, and attempts at suicide in the case of all applicants, regardless of whether the applicant was admitted to a hospital or had prior psychiatric treatment. Such consideration was, therefore, proper even though the interruption in the academic career resulted from, and the attempts at suicide resulted in, admission to a mental hospital.
There is ample evidence that students who have interrupted their academic career for any reason, have a higher attrition rate than those whose course of study is continuous, and that an attempt at suicide indicates an emotional and academic risk. If the plaintiff never had been admitted to a mental hospital but had indicated that she had interrupted her career for over 14 months and that she had made two attempts at suicide, she would have been rejected by the Admissions Committee as a risk to a successful completion of her medical courses and. as a practicing physician.
Likewise, the argument that by considering her past mental history, the defendant reduced and hence modified or varied her ranking, and thus modified or varied her civil right, is without merit. The defendant did not modify or vary her civil right, which was to apply for admission. She did not have a right to automatic admission.
To accept plaintiff’s interpretation of subdivision 5 of section 70 of the Mental Hygiene Law, would result in discrimination against all applicants who had not been patients in a mental hospital. A high academic rating and prior admission to a mental hospital would mandate automatic admission to the medical college.
Defendants’ rejection of plaintiff does not constitute a denial of due process and the equal protection of the law. So long as rules and standards for admission are fair and reasonable and are applied equally and fairly to all applicants, there is no violation of due process and the equal protection of the law.
In Matter of Lesser v. Board of Educ. (18 A D 2d 388) the court stated at page 391: ‘ ‘ More particularly, a court should refrain from interjecting its views within those delicate areas of school administration which relate to the eligibility of applicants and the determination of marking standards, unless a clear abuse of statutory authority or a practice of discrimination or gross error has been shown.-
* * *
“ Equally, the determination as to what factors should enter into the standards set for college admission was within the exclu *470 sive province of the college authorities. The judicial task ends when it is found that the applicant has received from the college authorities uniform treatment under reasonable regulations fairly administered.”
Plaintiff has failed to show any arbitrary or unreasonable treatment by the defendants with respect to her application for admission. The decision to reject plaintiff’s application was based upon her entire record, which included her grades, recommendations, tests, and personal interviews. All of the criteria were considered. The criteria and standards applied to her were neither unreasonable nor arbitrary, nor applied unfairly. The only bearing that her past mental history had was insofar as it was relevant to her being able to cope successfully with the medical .school curriculum and the ultimate practice of medicine. There was a reasonable basis for the decision of the Admissions Committee. Under the circumstances the court may not substitute its judgment for that of the Admissions Committee.
Judgment for defendants.