JOHN B., Respondent, v VILLAGE OF ROCKVILLE CENTRE et al., Appellants.

Second Department, November 18, 1985

### APPEARANCES OF COUNSEL

*Seward & Seward (James J. Seward* of counsel), for appellants.

*Axelrod, Cornachio & Famighetti (Robert M. Schaufeld* of counsel), for respondent.

### OPINION OF THE COURT

NIEHOFF, J.

The question on this appeal is whether the employment of a probationary police officer may be terminated at the end of the probationary term because the appointing officer has a good-faith basis for believing that the officer has "deep-seated emotional problems * * * and an inability to deal with stress-

ful situations" where the source for that belief is a report by a doctor who treated the officer for alcoholism. Petitioner contends that when the Commissioner of Police of the Village of Rockville Centre terminated his employment, the Commissioner violated Mental Hygiene Law § 33.01 which provides that no person shall be deprived of any civil right, including the right to civil service ranking "solely by reason of receipt of services for a mental disability".

In our judgment, Mental Hygiene Law § 33.01 prohibits the Commissioner from terminating petitioner's employment simply or solely because he sought and received treatment for alcoholism. It does not preclude the Commissioner from refusing to grant petitioner permanent employment status if the Commissioner, in good faith, believes that the diagnosis contained in the discharge report, which shows petitioner to have a continuing mental problem, may affect his ability to properly discharge the duties of a police officer.

### THE FACTS

The facts are as follows:

Petitioner was appointed as a probationary police officer with the Police Department of the Village of Rockville Centre on August 30, 1983. His probationary term was due to expire on March 21, 1984.

As part of his probationary training, petitioner participated in supervised field training with the Rockville Centre Police Department from the time of his appointment until on or about January 17, 1984, when he was assigned to the Nassau County Police Department Academy for a formal training course. While at the police academy, petitioner experienced what he characterized as an "embarrassing" situation when he was ordered to get a haircut. A few days later, on Sunday, January 22, 1984, less than a week after he started at the police academy, petitioner attended a party in New York City and had 3 or 4 beers. At about 8:00 P.M. that evening, as he was on the way home from the party, his car broke down and he spent the night at his brother-in-law's house. The next day, instead of reporting to the police academy, petitioner called in sick, claiming that he had the flu and a cold. The following day, January 24, 1984, petitioner admitted himself to an alcoholism rehabilitation program at South Oaks Hospital.

In his discharge summary, petitioner's doctor described petitioner's reasons for admitting himself for treatment as

follows: "As he underwent the course in the police academy, he as *[sic]* subjected to rather harsh emotional ordeals as part of the training. Since he was already suffering from severe emotional burdens regarding his guilt about the father's death, it was apparently too much for him to handle. To make things worse, following an embarrassing situation in the police academy, his car also broke down. Since that was his only means of transportation, the patient did not know what to do. He did not think about asking his fellow police officers to fix his car. Instead he went into a desperate mood. The patient then resorted to a rather uncontrollable binge drinking. Alerted by this, and also having seen his father going downhill with his alcoholism, the patient decided to stop his drinking all together. He then voluntarily admitted himself to South Oaks Hospital for alcoholism rehabilitation."

In describing petitioner's condition upon his discharge on February 11, 1984, petitioner's doctor reported that petitioner was no longer depressed and that his drinking problem was considered to be "successfully worked through". But, the final paragraph of the doctor's discharge summary concluded with these words: "The patient's major problem appears to be his inability to deal with emotionally charged issues due to his obsessive compulsive natures and his escape into alcohol abuse".

By letter dated March 13, 1984, the Commissioner of Police of the Village of Rockville Centre advised petitioner that his employment would be terminated at the end of his probationary period.

Thereafter, by notice of petition and petition both dated March 21, 1984, petitioner commenced this proceeding pursuant to CPLR article 78 to challenge his discharge. As indicated above, petitioner argued that his discharge was in violation of Mental Hygiene Law § 33.01 which provides that: "[N]otwithstanding any other provision of law, no person shall be deprived of any civil right, if in all other respects qualified and eligible, solely by reason of receipt of services for a mental disability nor shall the receipt of such services modify or vary any civil right of any such person, including but not limited to civil service ranking and appointment, the right to register for and to vote at elections, or rights relating to the granting, forfeiture, or denial of a license, permit, privilege, or benefit pursuant to any law".

In brief, petitioner claims that his discharge was improperly

motivated by the fact that he had sought treatment for alcoholism during the probationary period. However, during the hearing held as part of this proceeding, the Commissioner of Police testified unequivocally that he had not terminated petitioner's employment solely because he had sought treatment for alcoholism, i.e., for reasons prohibited by Mental Hygiene Law § 33.01. The Commissioner went on to state candidly that while he had not acted solely because petitioner had received treatment for alcoholism, the medical report rendered after petitioner had completed such treatment gave him reason to believe that there was a potential risk factor in granting petitioner permanent status because "police officers are often put into stressful situations that call upon them to be able to function under such conditions" and that the report disclosed that petitioner had "some deep-seated emotional problems * * * and an inability to deal with stressful situations".

Special Term found that the appellants had articulated no sound basis for petitioner's discharge apart from those prohibited by the Mental Hygiene Law. Accordingly, Special Term reinstated petitioner to the position of probationary police officer with all benefits and salary to which he would have been entitled had the dismissal not taken place.

For the following reasons, we reverse the judgment of Special Term.

It is a well-settled proposition that: "[T]he employment of a probationary appointee may be terminated at the end of the probationary term without a hearing and without reasons being stated and, in the absence of any allegation or demonstration that the termination was because of constitutionally impermissible reasons or prohibited by statute or policies established by decisional law, courts will not interfere with the discretion of the appointing officer unless the action complained of was arbitrary and capricious *(Matter of Bergstein v Board of Educ., Union Free School Dist. No. 1 of Towns of Ossining, New Castle & Yorktown, 34 NY2d 318, 322-323; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 230-231; Matter of Gordon v State Univ. of N. Y. at Buffalo, 35 AD2d 868, affd 29 NY2d 684; Matter of Going v Kennedy, 5 AD2d 173, 176, affd 5 NY2d 900; see Matter of Delicati v Schechter, 3 AD2d 19)" (Matter of Talamo v Murphy, 38 NY2d 637, 639).*

Since as a general rule the courts will not interfere with the discretion of the appointing officer to terminate employment at the end of the probationary term without a hearing and without reasons being stated, petitioner bore the burden of demonstrating that this case fits within an exception to the general rule, that is, that the termination was prohibited by statute, in that petitioner's employment was terminated solely by reason of his receipt of services for a mental disability.

It should be noted that Mental Hygiene Law § 1.03 (3) defines "mental disability" to mean "mental illness, mental retardation, developmental disability, alcoholism, or substance dependence". Mental Hygiene Law § 1.03 (13) further defines "alcoholism" to mean "a chronic illness in which the ingestion of alcohol usually results in the further compulsive ingestion of alcohol beyond the control of the sick person to a degree which impairs or destroys his capacity to function normally within his social and economic environment and to meet his civic responsibilities".

Applying those statutory definitions here, it is clear that petitioner received services for a mental disability within the meaning of Mental Hygiene Law § 33.01 when he admitted himself to the alcoholism rehabilitation program at South Oaks Hospital. Hence, petitioner has the right to claim the protection intended by the Legislature when it enacted Mental Hygiene Law § 33.01. However, in our view, both petitioner and Special Term are mistaken in their belief as to the nature of the protection which the statute affords.

In effect, petitioner contends that Mental Hygiene Law § 33.01 prohibits the Commissioner of Police from considering his mental or emotional problems which continued beyond the period of treatment in deciding whether to grant petitioner permanent status as a police officer. Petitioner can point to no case so holding.

The only case interpreting the scope of the protection guaranteed by the predecessor of section 33.01 which has come to our attention, namely, *Glassman v New York Med. Coll.* (64 Misc 2d 466), is not helpful to petitioner, for it holds that the disability which necessitated the services need not be ignored. Mental Hygiene Law former § 70 (5), which was involved in the *Glassman* case, provided: "Notwithstanding any other provision of law to the contrary no person admitted to a hospital by voluntary or informal admission shall be deprived of any civil right solely by reason of such admission

nor shall such admission modify or vary any civil right of any such person, including but not limited to civil service ranking and appointment or rights relating to the granting, forfeiture or denial of a license, permit, privilege or benefit pursuant to any law".

The plaintiff in *Glassman* contended that the defendants had violated that section in that they had rejected her application for admission to medical school solely because she had been a voluntary mental patient, or in the alternative, that defendants had relied upon her past mental history to modify, vary and reduce her competitive ranking in relation to other applicants for admission, and that an applicant's past mental history could not be considered. The court found that the statute did "not prohibit consideration of the illness which necessitated, or was the reason for, the admission to a mental hospital. It prohibits rejection of an applicant *solely* by reason of such admission" *(Glassman v New York Med. Coll., supra,* at p 468). The court further pointed out that: "[i]f the plaintiff never had been admitted to a mental hospital but had indicated that she had interrupted her career for over 14 months and that she had made two attempts at suicide, she would have been rejected by the Admissions Committee as a risk to a successful completion of her medical courses and as a practicing physician" *(Glassman v New York Med. Coll., supra,* at p 469).

Nor can the petitioner point to any legislative history to support his claim. The material contained in the bill jacket for the Laws of 1964 (ch 738), amending various provisions of the Mental Hygiene Law, does not aid petitioner. Although there is nothing in the bill jacket pertaining to the provision in question, Mental Hygiene Law § 33.01, the jacket does contain a memorandum from the president of the New York State Department of Civil Service concerning Mental Hygiene Law § 33.01's statutory forerunner, Mental Hygiene Law former § 70 (5), which militates against petitioner's position. The memorandum states: "We are satisfied that such provisions mean only that a voluntary or informal admission shall not, ipso facto, disqualify a person from eligibility for civil service appointment. This is quite reasonable. However, as we read these provisions, and Mr. Wiley [Counsel of the Department of Mental Hygiene] agrees, a civil service commission would not be foreclosed from disqualifying such a person on a finding based on evidence that he is actually incapacitated for the performance of the duties of the position he seeks. In other

words, an admission per se would not be disqualifying, but the person admitted could be disqualified on the merits."

Since no legislative history is available which clearly explains the purpose behind section 33.01, we consider it appropriate to quote the words of the late Justice Felix Frankfurter: "[T]his is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute" *(Greenwood v United States,* 350 US 366, 374).

The statute states, in pertinent part, that: "no person shall be deprived of any civil right, if in all other respects qualified and eligible, solely by reason of receipt of services for a mental disability".

If the petitioner had never received services for his "mental disability" (alcoholism) but had demonstrated an "inability to deal with emotionally charged issues due to his obsessive compulsive natures and his escape into alcohol abuse", it can hardly be denied that it would have been proper for the Commissioner of Police to terminate petitioner's employment because he would present a risk as a police officer. It seems clear to us from the language used by the Legislature that the fact that the petitioner sought medical services for a condition which he believed to be alcoholism cannot serve to deprive the Commissioner of the power which he otherwise possessed.

Had the Commissioner terminated petitioner's employment solely because he sought treatment for alcoholism, a problem which petitioner had successfully "worked through", the Commissioner would have run afoul of section 33.01. If the treatment for a mental disability is successful, a manifest injustice is done if the employer can terminate the employment merely because treatment has been sought and received, and it is evident to us that section 33.01 was enacted to prevent such an injustice. But the language chosen by the Legislature makes it clear that it never intended to provide that if the patient has a continuing mental disability which bears directly on his ability to properly perform the duties of his office, the employer has no remedy to protect himself merely because the employee has received, or is continuing to receive, treatment for some mental disability as defined by statute. Had the Legislature intended to provide that a person with a mental disability cannot be denied civil service ranking or appointment because of that or another mental problem he may have as long as he has received or is receiving treatment

for a mental disability, it could easily have said so. Instead, the Legislature plainly stated that the employer is only prohibited from denying civil service ranking or appointment "solely by reason of the receipt of services for a mental disability".

The obvious intent of the Legislature in developing legislation such as Mental Hygiene Law § 33.01, to wit, to encourage the treatment of mental disabilities and to eliminate some of the stigma attached to such disabilities, is highly commendable and may not be frustrated. Nevertheless, we do not read the language of such legislation as meaning that even if a serious problem affecting the employee's ability to perform his job is uncovered during the course of such treatment no action may be taken by a civil service employer. On the contrary, the statute specifically states that: "no person shall be deprived of any civil right, *if in all other respects qualified and eligible,* solely by reason of receipt of services for a mental disability" (emphasis supplied).

Consequently, if during the "receipt of services for a mental disability" it is revealed that the individual has emotional problems which bear upon his ability to properly discharge the duties of his job, the employer is allowed to consider this information in evaluating the qualifications of the individual for permanent employment.

If this court were to adopt petitioner's interpretation of Mental Hygiene Law § 33.01, then no matter what the diagnosis revealed, the individual who sought treatment could not have his civil service ranking or appointment altered in any manner. If, for example, a police officer were to receive services for a mental disability, and such treatment were to reveal that the officer had a serious mental disorder which bore directly on his ability to perform his duties, his condition could not properly be considered in evaluating the employee's qualifications, despite the fact that the police officer could pose a grave danger to the public. Surely, the Legislature could not have intended such an absurd and dangerous result. It is "always presumed that no unjust or unreasonable result was intended and the statute must be construed consonant with that presumption *(Matter of Breen v New York Fire Dept. Pension Fund,* 299 NY 8, 19; McKinney's Statutes, § 143)" *(Zappone v Home Ins. Co.,* 55 NY2d 131, 137).

No one can rightfully assert that it is unreasonable for the Legislature to seek to protect those who seek treatment for

mental disabilities. But, it would be unreasonable to conclude that the Legislature intended to require an appointing official to grant permanent employment to an individual who, due to a mental disability, is unsuited for a particular job, and we refuse to hold that Mental Hygiene Law § 33.01 precludes the termination of such an individual's employment in a probationary civil service position. While it is true that petitioner was not diagnosed as having any serious mental disorder, and he may well be able to perform in an exceedingly competent manner in many occupations, he was diagnosed as being unable to deal with stressful situations, which is the common fare of police officers. A court is not empowered to substitute its judgment for that of a Police Commissioner who is charged with the duty of overseeing law enforcement in his community by directing him to hire as a police officer an individual whom he in good faith believes may not be able to meet the stringent standards required of that position, and where there is evidence to support the Commissioner's decision.

There are some who may argue that our decision today may have a chilling effect upon those who might otherwise seek treatment for a mental disability, but fear adverse impact upon their employment or other rights. To this we reply that a balancing must take place between the competing interests of encouraging treatment for mental disabilities and the interests of employers in ensuring that their employees, especially those in sensitive positions such as police officers, who carry weapons, are capable of performing their duties. We conclude that this balancing test has already been conducted by the Legislature's inclusion in the statute of the language "if in all other respects qualified". It is significant to note that the statutory forerunner of Mental Hygiene Law § 33.01, Mental Hygiene Law former § 70 (5), did not contain this limiting language when it prohibited deprivation of any civil right, including civil service ranking and appointment, solely by reason of admission to a hospital.

In sum, it is apparent to us that in drafting Mental Hygiene Law § 33.01, the Legislature did not intend to tie the hands of civil service employers when dealing with a mentally disabled employee who, by reason of his mental disability, is unqualified to perform his job. It did not intend to make a probationary civil service employee who seeks treatment for a mental disability immune from termination of his employment if his mental problem renders him unqualified for his job.

We have already referred to the Commissioner's testimony

at the trial of this proceeding in which he specifically denied that he had terminated petitioner's employment solely because petitioner had sought treatment for alcoholism, but frankly acknowledged that he had been influenced by the doctor's diagnosis indicating that petitioner had deep-seated emotional problems and an inability to deal with stressful situations, an ability of true importance to police officers. We also note that the diagnosis petitioner received after his treatment is not the only evidence which supports the Commissioner's determination. The events precipitating his self-admission to the alcoholism rehabilitation program further indicate petitioner's inability to deal with stress.

There is no basis for our rejecting the truthfulness of the Commissioner's testimony as to his reasons for refusing to grant petitioner permanent employment as a police officer and, therefore, no basis for concluding that petitioner carried his burden of demonstrating that the Commissioner's decision was arbitrary and capricious, or the result of bad faith, or in violation of Mental Hygiene Law § 33.01.

Accordingly, we reverse the judgment of Special Term and dismiss the proceeding on the merits, with costs.

LAZER, J. P., O'CONNOR and WEINSTEIN, JJ., concur.

Judgment of the Supreme Court, Nassau County, dated November 19, 1984, reversed, on the law, with costs, and proceeding dismissed on the merits.